UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| STEPHEN H. MEADE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 14-380-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| BELLSOUTH | ) | **MEMORANDUM OPINION** |
| TELECOMMUNICATIONS, LLC, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendant BellSouth Telecommunications, LLC's ("BellSouth") motion for summary judgment. [Record No. 26] BellSouth contends that: (i) Plaintiff Stephen Meade's claims are barred because he did not exhaust his administrative remedies in a timely manner; (ii) the plaintiff has not established a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*; and (iii) Meade has not demonstrated a claim of intentional infliction of emotional distress. For the reasons outlined below, the Court agrees that Meade cannot establish a claim under the ADA or a claim of intentional infliction of emotional distress. As a result, BellSouth's motion for summary judgment will be granted.

**I.**

Meade was employed by BellSouth in 1977. He held the positions of Outside Plant Technician, Services Technician, "lineman," and Facility Technician. [Record No. 26-2, p. 3] From 2008 forward, Meade was employed as a Facility Technician ("Technician"). [Record No. 26-3, p. 2 ¶ 4] In this position, Meade was responsible for repairing or

installing telephone and internet services which required climbing poles and ladders, and working outside in different types of weather. [Record No. 26-3, p. 2 ¶ 5; Record No. 26-2, pp. 4–5]. The Technician job description indicates climbing poles and ladders, working aloft with small tools, and working outside in all kinds of weather are essential job responsibilities of the position. [Record No. 26-3, pp. 2, 6–8]. Usually, Technicians have at least one job, and often multiple jobs each day that require climbing, which Meade acknowledges. [Record No. 26-3, p. 2; Record No. 26-2, p. 6] Timothy Landers, a manager and Meade's former supervisor, estimates that Technicians are required to climb ladders or poles ninety percent of the time that they are on duty. [Record No. 26-3, p. 2]

The position of Technician is a represented position subject to the provisions of the Collective Bargaining Agreement ("CBA") between Communications Workers of America and BellSouth. [Record No. 26-3, p. 1] Under the CBA, a worker's seniority factors into, or governs, voluntary transfers, involuntary transfers, and filling vacancies by members of Communications Workers of America. [Record No. 26-3, p. 1]

On or about August 2010, Meade discovered a blood clot in his left leg. [Record No. 26-2, p. 7] Meade's blood clot, which resulted "from years of climbing," prevents him from climbing, being exposed to cold weather, and wearing boots. [Record No. 26-2, p. 7] Meade received short-term disability ("STD") benefits from September 8, 2010 through January 16, 2011. [Record No. 26-3, p. 3] The AT&T Integrated Disability Service Center (the "IDSC") administers STD benefits and work restrictions. [Record No. 26-3, p. 3] On January 27, 2011, the IDSC notified Meade's supervisor (at the time, Robert Summers) that Meade had been released to work on January 17, 2011, with temporary restrictions, including that he could not work outside in cold weather and could not climb through February 27, 2011.

-2-

Meade's anticipated return to work full duty date was "To be Determined." [Record No. 26-3, pp. 3, 9] Over the next year, Meade's temporary restrictions were extended and modified on several occasions. [*See* Record No. 26-3, pp. 3, 10.]

Starting January 17, 2011, BellSouth accommodated Meade's temporary restrictions by allowing him to work light duty for approximately one year. [Record No. 26-2, pp. 7–8; 10–11] Meade's "light duty" position consisted of answering the phone, doing some computer work, assisting the engineers with note-taking, shredding documents, taking measurements, and staying current with training courses. [Record No. 26-2, pp. 8–9] Other employees had to take more jobs to make up for the work Meade could not perform while on light duty, which caused BellSouth to pay overtime to other Technicians. [Record No. 26-3, p. 4] Meade argues that he was "reassigned" to the engineering department during the time he was on light duty, but he does not argue that his light-duty position was a separate position that existed at any time before or after he filled that role.

In October 2011, Timothy Landers replaced Summers as Meade's direct supervisor. [Record No. 26-3, p. 3] On January 6, 2012, (after Meade sent Landers additional correspondence from his doctor) Meade and Landers spoke on the phone to discuss Meade's options if he could not return to the Technician job. [Record No. 26-3, p. 3] On February 17, 2012, the IDSC notified Landers that Meade's restrictions, which included prohibitions on climbing, cold weather exposure, and wearing boots, were permanent. [Record No. 26-3, pp. 4, 12] Thereafter, on February 20, 2012, Landers informed the IDSC that the department could not accommodate Meade's restrictions on a permanent basis. [Record No. 26-3, p. 4]

On February 24, 2012, and again on March 1, 2012, Landers told Meade that the department could not accommodate his medical restrictions on a permanent basis, but would

-3-

allow Meade to continue on light duty[1] until he had met with human resources and had been fully informed of all of his options under the Permanent Medical Restrictions ("PMR") process as outlined in the CBA.  [Record No. 26-3, p. 4]  While Meade was making his choice among the options presented to him, he was allowed to work light duty.  [Record No. 26-2, p. 9]

On April 9, 2012, Meade participated in a conference call with Staffing Manager Sylvia Thomas and representatives with the Communication Workers of America to explain the PMR process.  [Record No. 26-4, p. 1]  BellSouth had several options under the PMR process, some of which permitted the employee to remain on payroll, and some of which permitted the employee to exit payroll.  [Record No. 26-4, p. 2]  Meade was given a list of two jobs, which were at or below his job title as a Technician, on the Vacancies List.  [Record No. 26-4, p. 2]  Meade would have received priority consideration for these vacancies and, regardless of the wage of the new position, he would be entitled to his Technician salary for 36 months under the terms of the CBA.  [Record No. 26-4, p. 2]  Another option to remain on payroll under the CBA was the "Ready Taker List."  [Record No. 26-4, p. 2]  The Ready Taker List consisted of positions available at his current or lower wage.  [Record No. 26-4, p. 2]  The "Ready Taker List" identified one job at his Wage Scale or below.  [Record No. 26-4, pp. 2, 8]  If Meade had selected the Ready Taker position, then his current wage would have been in effect for 36 months.  [Record No. 26-4, p. 2]

---

[1] Meade alleges that Landers sent him an e-mail to "go home, show [his] vacation time, and personal days" at some point during this time frame, but the e-mail has not been produced to the Court and the timing is unclear from Meade's deposition. [Record No. 26-2, p. 12] He does not contest Landers' description of the timeline of events or BellSouth's description of the different options made available to him during the conversation with Thomas.

Additionally, independent of the Vacancy or Ready Taker lists, Meade could submit two optional requests for a job title "in his family of skills, within his organizational unit," which was another option available through the CBA. [Record No. 26-4, pp. 2-3] His wage would have been protected for 36 months under this option as well. [*Id.*]

Further, Meade could remain on the payroll and take a sabbatical leave for 9 to 24 months, during which time he would have received company paid medical, dental, vision, and group life benefits. [Record No. 26-4, p. 3] He could also remain on the payroll and take a technological leave for 12 months, renew for an additional 12 months, and receive group life benefits during that time. [Record No. 26-4, p. 3] Thomas advised Meade that he could take "SIPP" pay, which is voluntary payment by which he would have exited the payroll.[2] [Record No. 26-4, p. 3]

Under the terms of the CBA, if BellSouth was unable to offer Meade a position of equal or lower level through the Ready Taker or Vacancy List, he would be eligible for termination pay ("term pay"). [Record No. 26-4, p. 3] Term pay could be paid in a lump sum or Meade could elect to receive term pay while participating in the Partnership Job Bank ("Job Bank"). [Record No. 26-4, p. 3] Time in the Job Bank is determined under the CBA based on seniority. [Record No. 26-4, p. 3] Based on his seniority, Meade was eligible to receive an allowance equal to 40 weeks of his then-current rate of pay while participating in the Job Bank. [Record No. 26-4, p. 3] On the conference call held on April 9, 2012, Meade was told that if he elected to go into the Partnership Job Bank, he could apply for jobs posted in the Career Resource Center. [Record No. 26-4, p. 4] Meade would receive priority staffing for any job vacancies for which he applied through the Career Resource Center.

---

[2]   The parties did not further elaborate on the meaning of "SIPP" or its mechanics.

[Record No. 26-4, p. 4]  On the April 9, 2012 conference call, Thomas explained that if Meade did not find a job by the end of the 40 weeks after entering the Job Bank, he would exit the payroll.  [Record No. 26-4, p. 4]

Meade was provided with a Master Ranking Sheet on April 9, 2012, on which Meade was to rank jobs that he preferred from either the Vacancy List or the Ready Taker List, or optional job requests, which were offered independent of the Vacancy or Ready Taker List.  [Record No. 26-4, p. 4]  Meade did not check any box to indicate that he was interested in new vacancies that may become available during the processing of his PMR or rank any job preferences.  [Record No. 26-4, pp. 4, 10; Record No. 26-2, pp. 14–15]  Instead, Meade noted on the Master Ranking Sheet that he preferred to participate in the Job Bank.  [Record No. 26-4, pp. 4, 10; Record No. 26-2, pp. 14–15]  On April 24, 2012, BellSouth sent a letter confirming that Meade would participate in the Job Bank from April 22, 2012, through January 26, 2013, during which time he would receive his regular pay.  [Record No. 26-2, pp. 14–15, 30]

While in the Partnership Job Bank, Meade had the opportunity to be considered for other positions.  [Record No. 26-2, pp. 14–15, 30–31]  Meade was provided with a Temporary Assignment Interest Form that asked about his skills and interests, which he did not fill out because he "wasn't looking for temporary work."  [Record No. 26-2, pp. 14–15, 30–31]  Meade did not apply for any jobs while he was in the Job Bank, regardless of whether they were classified as temporary.  [Record No. 26-2, pp. 14–15, 18, 30–31; Record No. 26-4, p. 4]

Although Meade had a user name and password to access the Career Resource Center and knew that jobs were posted there, he did not use the Career at any point, and he did not

apply for any jobs posted through the Center. [Record No. 26-2, pp. 16–17] Instead, Meade believed that he would be affirmatively notified of any openings through the Career Resource Center and/or Job Bank rather than needing to proactively search for a position or openings. [Record No. 26-2, pp. 16–18] He does not identify any basis for his belief that he would be contacted directly when a position became available. Meade did not reach out to anyone affiliated with BellSouth or Communications Workers of America to inquire about jobs or ask for assistance accessing the Career Resource Center. [Record No. 26-2, pp. 17–18] He testified that he wanted to remain on "light duty" or be offered a job consistent with his restrictions, although he never made any specific requests for this type of position from his supervisors or anyone with BellSouth. [Record No. 26-2, pp. 7–8, 12, 23]

With respect to his specific limitations, Meade stated that, with the exception of Landers, no one affiliated with BellSouth made any comments about his disability or restrictions. At some point, while discussing Meade's restrictions from duty, Landers asked in a joking manner, "[w]hat the hell is cold weather?" [Record No. 26-2, p. 25] While Meade alleges that he suffered emotional distress from Landers' comments regarding his restrictions, he does not claim to have sought any medical treatment. [Record No. 26-2, pp. 27–28]

Although Meade learned that Michael Young retired from his position of "supply clerk" in September or October 2012, Meade did not apply for that position. Again, Meade believed that he assumed someone would contact him. [Record No. 26-2, pp. 22–23] BellSouth states that Young was an employee of BellSouth and occupied the position of Material Service Coordinator until he left the company. [Record No. 26-5, p. 1] After Young left BellSouth, that position was not made available through the company, but was

-7-

contracted to an outside vendor. [Record No. 26-5, p. 2] Meade expected to receive notifications of job openings via phone call or mail while he was in the Job Bank, but did not inquire during the 40 weeks he was in the Job Bank about the job application process. [Record No. 26-2, p. 24] Meade does not point to any other person in the Job Bank who received different treatment. However, Meade believes that Landers discriminated against him by "sending him home." [Record No. 26-2, pp. 25–26]

## II.

Summary judgment is appropriate when there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

**A. Meade Timely Exhausted His Administrative Remedies.**

Meade was required to file a timely discrimination charge with the Equal Employment Opportunity Commission ("EEOC") to bring a claim under the ADA, 42 U.S.C. § 12131, *et seq.* *See* 42 U.S.C. § 12117(a) (adopting Title VII enforcement scheme and

remedies for ADA, i.e., 42 U.S.C. § 2000e-5(e)).  A party has 180 days after the alleged unlawful employment practice to file a charge, unless an aggrieved party has initially instituted proceedings with a State or local agency.  In that case, a 300-day limitation applies.  42 U.S.C. § 2000e-5(e)(1); *Jones v. AIRCO Carbide Chemical Co.*, 691 F.2d 1200, 1201–02 (6th Cir. 1982) ("In deferral states [like Kentucky], a plaintiff has 300 days to file a charge of discrimination with the EEOC.").  The parties agree that the 300-day limitations period applies,[3] but disagree on when the period of limitations began to run.

The United States Court of Appeals for the Sixth Circuit, consistently with the Supreme Court of the United States, has concluded that "the limitations period does not begin to run on a claim for employment discrimination until an employer makes and communicates a final decision to the employee.  Once the employee is aware or reasonably should be aware of the employer's decision, the limitations period commences." *EEOC v. United Parcel Serv., Inc.*, 249 F.3d 557, 561–62 (6th Cir. 2001) (citations omitted); *see also Sam Han v. Univ. of Dayton*, 541 F. App'x 622, 627–28 (6th Cir. 2013) (finding that limitations period began to run when the plaintiff learned that his contract would not be renewed).

BellSouth argues that, based on Meade's arguments to the Court, he knew on April 9, 2012, that he would be removed from payroll 40 weeks later (i.e., on January 26, 2013) if he did not find another position.  Thus, BellSouth argues that April 9, 2012 was the latest date that the limitations period began to run and he was required to file his charge by February 3, 2013.  Meade argues that he was still receiving his salary and benefits and, therefore,

---

[3] Meade received a Right to Sue letter from the EEOC and that his Complaint was filed within ninety days from the Right to Sue letter.  The parties have not addressed whether the EEOC made any determination regarding the timeliness of Meade's initial charge.

employed until January 26, 2013. [Record No. 27, p. 4] Because he was still an employee until January 26, 2013, Meade contends, he timely filed his intake questionnaire on November 17, 2013. This argument contradicts Meade's allegations that he was terminated by Landers in 2012. Nonetheless, both parties agree that Meade had the option—albeit unexercised—to remain employed by BellSouth past January 26, 2013, if he had chosen to apply for a vacant position.

Although Meade was notified on April 9, 2012, that his employment would end on January 26, 2013, if he did not find another position, both BellSouth and Meade contemplated that his employment could continue past January 26, 2013. *See United Parcel Service*, 249 F.3d at 562 (finding that limitations period did not run until after conclusion of "on-going interactive process . . . to find some reasonable accommodation for his disability."). Because Meade had the opportunity to avail himself of other open positions before January 26, 2013, the limitations period began to run on that date. Therefore, Meade timely filed his charge of discrimination with the EEOC.

**B. Meade Has Not Demonstrated That He Is Entitled To Relief Under The ADA.**

"Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wright v. Memphis Light, Gas & Water Div.*, 558 F. App'x 548, 553 (6th Cir. 2014) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F. 3d 911, 914 (6th Cir. 2013)). After receiving notice of Meade's permanent restrictions, which included a restriction against working in cold weather, Meade's supervisor, Landers, called him, "laughing, making fun about cold – 'what's cold weather.'" [Record No. 26-2, p. 11] This is the only isolated comment made about Meade's permanent workplace restrictions. It does not represent an

explicit statement of discrimination on its face and is not direct evidence of discrimination against Meade based on his disability. *See Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 454–55 (6th Cir. 2004); *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 661 (6th Cir. 1999).

Mead's claims also fails, to the extent that it is premised upon BellSouth's failure to offer a reasonable accommodation. *Brown v. Humana Ins. Co.*, 942 F. Supp. 2d 723, 730–33 (W.D.Ky 2013) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). To demonstrate an ADA claim for failure to accommodate, Meade must show: (i) that he is disabled[4] within the meaning of the ADA; (ii) that he is otherwise qualified for the position, with or without reasonable accommodation; (iii) BellSouth knew or had reason to know of his disability; (iv) he requested an accommodation; and (v) BellSouth failed to provide the necessary accommodation. *Brown*, 942 F. Supp. 2d at 731 (citing *Myers v. Cuyahoga Cnty., Ohio*, 182 F. App'x 510, 515 (6th Cir. 2006)).

Meade agrees that he was not qualified for his position as Technician, with or without a reasonable accommodation. The Technician position required that Meade climb, work in cold weather, and wear protective boots, all of which Meade acknowledges he could not do with his permanent work restrictions. Meade has not requested any type of accommodation which would allow him to stay in the position of Technician. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010) ("An employee has the burden of proposing an initial

---

[4] Although not raised by the parties, it is unclear, based on the record before the Court, whether Meade is "disabled" within the meaning of the ADA. Meade is restricted from climbing, being exposed to cold weather, and wearing boots. Neither party has established that these physical impairments substantially affect one or more major life activities as required to be considered disabled under the ADA. *See E.E.O.C. v. DaimlerChrysler Corp.*, 111 F. App'x 394, 400–04 (6th Cir. 2004); *Szalay v. Yellow Freight System, Inc.*, 998 F. Supp. 799, 802–03 (N.D. Oh. 1996).

accommodation."). Instead, Meade argues that he was being accommodated in his "light duty" position between January 2011 and January 2012. In January 2012, Meade's physicians indicated that his restrictions were permanent, meaning he could not return to his job as a Technician. Meade faults BellSouth because it did not allow him to stay in the "light duty" position. However, it is undisputed that this position was not a permanent one, but a position that had been created as a temporary solution while Meade was under temporary, rather than permanent, medical restrictions. [Record No. 26-2, p. 9]

While BellSouth allowed Meade to fill this role as a temporary accommodation, BellSouth was under no obligation to shift essential job functions onto others or to create a position to accommodate Meade on a permanent basis. *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 662 (W.D. Ky. 2012) (citing *Hoskins v. Oakland Cnty. Sheriff's Dept.*, 227 F.3d 719 (6th Cir. 2000); *Monette v. Elec. Dada Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996)). Further, Meade admits that he did not ask to remain in the light duty position but assumed that anyone with "common sense" would know that he wanted to remain in the light duty position. [Record No. 26-2, pp. 7–12, 23]

Nonetheless, BellSouth offered Meade several options as alternatives to the Technician position, which Meade chose to ignore. Meade alone determined that he would not pursue any of the options available through the CBA. The ADA's regulations allow that, "'[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee].'" *Kleiber*, 485 F. 3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)). This process "requires communication and good-faith exploration of possible accommodations." *Id.* (quoting *Barnett v. U. S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc)). When the

interactive process breaks down, either due to one party obstructing the process or otherwise failing to participate in good faith, the reviewing court "should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.* (quoting *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

      BellSouth presented Meade with several positions for which he was qualified and that would have allowed him to remain on the payroll at the same level of pay for at least 36 months. These positions were made available through the Ready Taker and Vacancy Lists through the PMR process under the CBA. But instead, Meade chose to participate in the Partnership Job Bank, which would have allowed him to obtain another position during the 40 weeks that he was entitled to participate. However, Meade chose not to pursue any positions during that 40 week time period. He also chose not to fill out the forms demonstrating his interest in available temporary positions. Meade does not dispute that he was offered various options in April 2012, that he voluntarily chose the Job Bank, or that he received notification through the Career Resource Center of job openings. Instead, Meade faults BellSouth for not calling or notifying him when positions became available. He does not allege that anyone told him that the Job Bank worked in that manner, and admits that he did not reach out to anyone during the 40 weeks he was participating in the job bank to inquire about vacancies or accessing the Career Resources site. Meade cannot sit idly by for 40 weeks without taking any proactive measures to pursue vacancies and then cry foul when he is unemployed at the end of the process. Meade did not participate in the accommodation process in good faith, because he simply did not participate.[5] His choice to join the Job

---

[5] Meade now complains that he was not offered a supply clerk position that became available during that time period. This position was contracted to a third-party, and never made

Bank, and his subsequent failure to participate in it, means that he cannot demonstrate that BellSouth failed to accommodate his job restrictions.

For the same reasons, Meade cannot show employment discrimination through indirect evidence. To demonstrate a *prima facie* case of employment discrimination through indirect evidence, Meade must show that: (i) he is disabled; (ii) he is otherwise qualified for the position, with or without reasonable accommodation; (iii) he suffered an adverse employment decision; (iv) BellSouth knew, or had reason to know, of his disability; and (v) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tenn.*, 639 F.3d 253, 258–59 (6th Cir. 2011) (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)). Meade acknowledges that he was not qualified for the Technician position and has not identified any other position for which he was qualified and willing to perform.

Further, Meade did not suffer an adverse employment action by BellSouth. Meade alleges that he was told to "go home," but he does not contest that the various options for continued employment were made available as described by BellSouth through the CBA and PMR process. Meade chose the Job Bank, knowing that he would no longer receive a paycheck if he did not find another position within 40 weeks. His employment ended because he failed to take advantage of the opportunities for employment that were offered to him by BellSouth through the PMR and Job Bank. *See Wichowski v. Gen. Elec. Co.*, 9 F.3d 111, 1993 WL 337743, at *3–4 (6th Cir. 1993) (unpublished table decision) (finding that plaintiff who chose voluntary layoff rather than available position with the defendant did not

---

available as a position with BellSouth. Further, Meade has notdemonstrated that, if the supply clerk position had been available, he would have applied to fill it.

suffer an adverse action); *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991) ("The presentation to [the plaintiff] of other legitimate options for continued employment with the company, even in less prestigious positions, precludes a finding that he was constructively discharged."). As a result, Meade's claim under the ADA will be dismissed.

### C. Meade Has Not Established A Claim Of Intentional Infliction Of Emotional Distress.

The tort of outrage, also known as intentional infliction of emotional distress, is typically considered a "gap-filler," meaning that the tort of outrage is available where a more traditional tort would not provide an appropriate remedy. *Brewer v. Hillard*, 15 S.W.3d 1, 7–8 (Ky. Ct. App. 1999) (citing *Rigazio v. Archdiocese of Louisville,* 853 S.W.2d 295, 299 (Ky. Ct. App. 1993)). To prevail on a claim for outrage, "[t]he wrongdoer's conduct must be intentional or reckless; the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality." *Osborne v. Payne*, 31 S.W.3d 911, 913–14 (Ky. 2000). "Liability has been found only where the conduct has been . . . so extreme in degree[] as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Runkle v. Fleming*, 558 F. App'x 628, 634 (6th Cir. 2014) (internal quotations omitted).

Meade's allegation that his supervisor laughed and asked "what is cold weather" when discussing Meade's work restrictions is not sufficiently outrageous to support a claim for intentional infliction of emotional distress. Meade makes no specific allegations that are "truly outrageous, intolerable[,]" or would "result[] in bringing one to his knees" as required to maintain an action for intentional infliction of emotional distress. *Osborne*, 31 S.W.3d at

914. Additionally, Meade's testimony that "it was bad for a little bit" [Record No. 26-2, pp. 27–28] is insufficient as a matter of a law to support an award for emotional distress. *See Benningfield v. Pettit Envtl., Inc.*, 183 S.W.3d 567, 572 (Ky. Ct. App. 2005) (requiring that a harmed party claim to have suffered "distress that is substantially more than mere sorrow"). This claim will be dismissed because Meade has not alleged that BellSouth acted in a truly outrageous or intolerable manner, or that he suffered "severe" emotional distress as a result.

## IV.

There are no genuine material issues of fact in dispute and the defendant is entitled to judgment in its favor on all claims asserted by the plaintiff. Accordingly, it is hereby

**ORDERED** as follows:

1. Defendant BellSouth Telecommunications, LLC's motion for summary judgment [Record No. 26] is **GRANTED.**

2. This action is **DISMISSED**, with prejudice, and **STRICKEN** from the Court's docket.

3. The pretrial conference, previously scheduled for November 18, 2015, and the trial, previously scheduled for December 14, 2015, are **CANCELED** and **SET ASIDE**.

This 12th day of November, 2015.



Signed By:
*Danny C. Reeves* DCR
United States District Judge